[Crim. No. 4544.   In Bank.   Dec. 22, 1944.]

THE PEOPLE, Appellant, v. MAX LESLIE GILBERT et al., Defendants; JOHN NORMAN LOVELACE et al., Respondents.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Appellant.

Nathan O. Freedman, A. Wm. Christlieb and Morris Lavine for Respondents.

THE COURT.—This is an appeal by the plaintiff from an order of the trial court by which it attempted to modify to life imprisonment, as to each of two defendants, judgments imposing the death penalty for murder, which judgments had been theretofore pronounced by that court and affirmed on appeal by this court (*People* v. *Gilbert*, 22 Cal.2d 522 [140 P.2d 9]). The defendants had pleaded guilty to the crime charged, the trial court had taken evidence upon which it found that the murder was of the first degree (admittedly committed in the perpetration of robbery; Pen. Code, § 189), and had fixed the punishment as death. Each defendant appealed from the judgments then pronounced.

The proceedings in which the instant appeal is taken were had after the going down of the remittitur on the judgment of this court affirming the judgments so appealed from. One of the defendants (Lovelace) moved to vacate both the judgment and his plea of guilty; the other defendant (Lyle Cecil Gilbert) moved only "to vacate the judgment heretofore rendered." Lovelace predicated his motion on the ground that he "was deprived of his right of trial and induced to plead guilty . . . through extrinsic fraud, misrepresentation, coer-

cion and wrongful persuasion practiced upon him," while Gilbert's motion was based on the contention that he had "been denied due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States." The trial court made written findings of fact and conclusions of law (presumptively in the view that an application for a writ of error *coram nobis* is a civil proceeding [see *State* v. *Ray*, 111 Kan. 350, 207 P.192]) wherein it found that the defendants in entering their pleas of guilty and in giving certain false testimony "relied on the acts, conduct and appearances on the part of the State, as well as upon the statements of their own counsel, that life sentences would be pronounced and had been guaranteed." It held that the judgments originally pronounced were "null and void under the Fourteenth Amendment"; that "the defendants were denied the benefit of effective aid of counsel as guaranteed by the Fourteenth Amendment to the Constitution of the United States"; that such judgments were "based upon perjured testimony *given by the defendants themselves* [italics added], acting in reliance upon a promise that they would receive life sentences"; that such promise "was based upon acts and conduct on the part of officers of the State and of defense counsel, and that this constituted an agreement and bargain which *estopped* the State of California from imposing sentences of death in this case." *The court did not vacate the pleas of guilty but proceeded to pronounce new judgments, sentencing the defendants to life imprisonment.* As previously mentioned the People appeal. We find no law to sustain such action of the trial court upon the facts shown.

The conclusion that "the defendants were denied the benefit of effective aid of counsel as guaranteed by the Fourteenth Amendment" is based upon evidence that counsel for these defendants was not present at all times during the trial of one Max Gilbert and did not in that trial adduce testimony or cross-examine witnesses relative to the guilt of, or asserted mitigating circumstances affecting, these defendants.

The record does not disclose any dereliction of duty in this regard by defendants' counsel. It shows that these two defendants and Max Gilbert were charged jointly with four felonies: (1) the murder of police officer Lee N. Bunch; (2) the robbery of H. N. Griffin; (3) the attempted murder of Benjamin Bailuis; (4) the attempted murder of Charles Piercey.

Four prior convictions of felony as against the defendant Lyle Cecil Gilbert and one against defendant Lovelace were also alleged. The codefendant Max Gilbert entered a plea of not guilty to all the charges. Each respondent entered a plea of guilty to the charge of murder in count one and denied the prior convictions. It was thereupon stipulated that the evidence theretofore adduced at the preliminary hearing and also the evidence which thereafter should be taken at the trial of Max Gilbert could be considered by the court for the purpose of fixing the degree of the crime and the sentences to be imposed. It was further agreed that the prosecution and the defendants "may introduce additional evidence if they so desire." Upon the hearing as to these defendants, subsequent to the Max Gilbert trial, the charges of prior convictions were found to be true, and, as above mentioned, the murder was found to be of the first degree and the death penalty was imposed.

On the prior appeal respondents, as appellants therein, contended that the trial court was guilty of an abuse of discretion in that: (1) it refused to permit any evidence affecting appellants alone to be introduced at the trial of Max Gilbert; (2) it made remarks from the bench and asked questions pertaining to the crime of kidnaping, with which offense appellants were not formally charged; (3) at the time of judgment it read a prepared statement which appellants asserted indicated a conclusion previously reached "without taking into any account the evidence offered in behalf of the defendants"; and (4) assertedly it allowed public clamor in connection with another pending criminal case to influence its judgment in this case. In disposing of the first contention, that during the trial of Max Gilbert the trial court improperly refused to admit certain evidence not affecting Max Gilbert and relating only to the appellants therein (these respondents), we stated that (p. 527 of 22 Cal. 2d) "the record shows that during that trial counsel for appellants stated there were one or two things which did not concern Max Gilbert and about which she desired to question appellant Lovelace at that point, for the consideration of the court in determining the degree of the crime as to the appellants. The trial judge then stated, 'Well, I think we will take that up in subsequent proceedings.' This ruling of the trial court was in accordance with the prior stipulation and, moreover, the order

of the proof rests in the discretion of the trial court. Although assigning as an abuse of discretion the refusal to receive the evidence at that time, appellants do not contend that the court refused to accord them a full opportunity to produce all the evidence they desired prior to fixing the degree of the crime.'' Certainly, in the light of the stipulation which was made, and the ruling of the trial court in respect thereto as above set out, defendants' counsel cannot now be held to have so neglected her duty in relation to defendants as to constitute a denial of ''the benefit of effective aid of counsel as guaranteed'' by the Constitution merely because she was not present during all of the trial of the codefendant Max Gilbert and did not take an active part in that trial except while her clients were on the witness stand. The ruling of the trial court at that time has been affirmed and the conduct of counsel conforming to it was proper. Furthermore, as pointed out in our opinion in the previous appeal (p. 528 of 22 Cal.2d), ''A hearing for the determination of the degree of an offense and the punishment therefor is not a trial in the full technical sense, and is not governed by the same strict rules of procedure as a trial . . . and 'in considering evidence in aggravation or mitigation of the offense the court may consider many matters *''not admissible on the issue of guilt or innocence.* . . .'' ' '' The guilt of the defendants was established by their pleas. No lack of due process in the proceeding to determine the degree of their crimes and the appropriate punishment can be deduced from the receipt of the Max Gilbert trial evidence regardless of whether defendants or their counsel were absent from, or did not participate in, that trial.

The finding that ''the defendants . . . were promised that they would receive a life sentence if they entered a plea of guilty and that this promise was based upon acts and conduct on the part of officers of the State and of defense counsel'' is based upon evidence which in part is quoted and in part summarized as follows:

Defendant Lovelace stated by affidavit that ''during the latter part of April or the first part of May, 1942, . . . Mrs Bates [his then attorney] stated to this affiant that she had very good news, that she had reached an agreement with the district attorney's office and in particular with Deputy District Attorney Arthur L. Veitch . . . and the trial judge . . .

[before whom the trial was scheduled] whereby the four charges then pending against this affiant would be reduced to one charge of murder, and this affiant would automatically be given a life sentence''; that ''on or about July 13, 1942, in a conference . . . between . . . [defendant Lovelace], his mother Margaret Lovelace and the said Mrs. Bates, the said Mrs. Bates again stated that she had talked with Judge McKay concerning this affiant, and that he had stated to her that he had never yet sentenced a man to death since he had been on the bench, which had been thirty-three years, who did not actually fire the fatal shot, and that he could not conceive of any circumstances in which he would do so, that District Attorney Veitch had agreed not to ask for the death penalty . . . , that affiant should plead guilty to the murder charge herein but not to any specific degree, *which would be fixed at the conclusion of the trial of Max Gilbert,* and would be passed upon the testimony offered in that trial. . . . That because of the severity of the charges herein, and *because this affiant knew in his own mind that it was possible that he might be sentenced to death, and for the purpose of saving his life,* and believing implicitly in the said Mrs. Bates and her representations, he agreed to waive the jury and enter a plea of guilty to the murder charge herein, with the understanding at all times that he would be sentenced to a life sentence thereon.'' (Italics added.)

At the hearing on these motions defendant Lovelace testified that he and defendant Lyle Cecil Gilbert pleaded guilty because their attorney, Mrs. Bates, told them they ''wouldn't get the death sentence'' if they pleaded guilty, and that ''She had seen the Judge and talked with the Judge, and the Judge had told her he had never sentenced a man to death that hadn't actually fired the fatal shot and killed a man; that in his years on the bench he had never sentenced a man to death that hadn't actually fired the fatal shot, and he couldn't conceive of himself doing so; and inasmuch as Lyle and I hadn't hurt anyone or killed anyone, that we wouldn't get the death penalty. On that understanding we pled [sic] guilty. . . [S]he told me at least six or seven times . . . [before] the trial started, and numerous times during the trial, that we had nothing to worry about, to just go down there and plead''; and that he had at first objected to entering a plea of guilty, but after Mrs. Bates told him ''she had talked with

the Judge and the Judge said he wouldn't sentence us to the death penalty'' he consented to such a plea.

These two defendants testified both at the Max Gilbert trial and at the subsequent hearing for the purpose of determining the degree of the crime to which they had pleaded guilty. Concerning his testimony given on these occasions defendant Lovelace now testifies that he would never have taken the stand or pleaded guilty if it ''wasn't cut and dried I would get a life sentence''; that his attorney stated to him, when he objected to testifying, ''you have got nothing to worry about. It is all cut and dried. You are going to get a life sentence. You can't hurt yourself. Go up [to the witness stand], and you might be able to help him [Max Gilbert]''; that at the Max Gilbert trial he falsified his testimony by representing to the court that Max (whose role in the crimes was that of driving the automobile in which the four participants traveled to and from the scene where the crimes took place) did not know ''what was going to happen when we got out there,'' and was not to receive a share in the anticipated proceeds of the robbery, whereas Max actually did know there was to be a ''shakedown''; that he took the stand to do the best he could to try to get Max Gilbert off and colored his own testimony as outlined above for the purpose of assisting Max; that all of his testimony concerning his own part in the crimes, including the events leading up to them, was true, but that it was not as full as it would have been had he not been assured in advance that he would not receive the death penalty. He then proceeded to give to the court a more complete picture of his background and upbringing, of the circumstances surrounding his prior convictions, and of the reasons he participated in the robbery during which the murder was committed, including his asserted physical fear of Horgan (whom these defendants describe as the ringleader in the robbery and murder and whose gun fire killed officer Bunch) resulting from threats he claims were made against him by Horgan.

Defendant Lyle Cecil Gilbert testified that during the first week of July, 1942, Mrs. Bates, at a conference at which he and defendant Lovelace, Max Gilbert, and the latter's attorney Mrs. Kellogg were present, stated that she had talked to Judge McKay, ''explained the situation to him . . . and he said . . . he realized that neither of us defendants had fired

the fatal shot, and that he couldn't conceive of ever sentencing a man to death who was not the actual killer; and that she had his word for it, and . . . that if we were to go down there and plead guilty, that we would be guaranteed a life sentence. . . She also said . . . 'Now, this is no longer a gamble, it is a sure thing,' '' and that it was in reliance upon such statements that he agreed to enter a plea of guilty and that he took the witness stand during the Max Gilbert trial. He stated further that — also in reliance upon such statements — in his testimony given at such trial and in order to protect Max, he assumed more of the responsibility for planning and executing the crimes than was actually his; he does not claim, however, that Max participated in the planning or played any role other than that of driver of the automobile in which the four perpetrators of the crimes drove to and from the scene; rather, he now states that the blame which he assertedly falsely assumed at the Max Gilbert trial rightfully belonged to Horgan. No rational reason is apparent as to why he should at any time have assumed responsibility falsely for Horgan's acts.

Mrs. Leola Buck Kellogg, the attorney who represented Max Gilbert at his trial, testified (with his written consent) that at a conference held prior to his trial and prior to the entry of the pleas of guilty by these defendants, at which she and her client, Max Gilbert, and Mrs. Bates and these two defendants were present, Mrs. Bates said, "Max Gilbert, you should change your plea from not guilty to guilty of murder in the first degree, because I have it all fixed with the judge and the District Attorney. I went to see Judge William McKay. . . . I asked him what he would do if the defendants pleaded guilty to murder in the first degree; that thereupon Judge William McKay said to me . . . that he had never sentenced a man to death unless that man had actually fired the shot . . . [Y]ou should all plead guilty to murder in the first degree. There is no question now about its being a gamble; it's a certain thing; it's all fixed''; that on another occasion when the same parties were present Mrs. Bates stated to the three culprits, "You know you're guaranteed now, you're guaranteed life before Judge McKay; there is no gamble about it. I can guarantee you that sentence if you plead guilty to murder in the first degree''; that these two defendants (Lovelace and Lyle Cecil Gilbert) during the con-

ferences above described stated they did not want to plead guilty and that Mrs. Bates then said, "Why, there is nothing to it. I'll guarantee you, you'll get nothing but life if you will plead guilty to murder in the first degree, and the other two charges will be dropped and the death penalty will not be asked."

The mother of defendant Lovelace testified that on July 13, 1942, Mrs. Bates stated to her and to such defendant that "I have talked to the Judge this morning. . . There is no more gamble. He has promised a life sentence, and it's all fixed . . . and now we have nothing more to worry about. And Jack [defendant Lovelace] pleads guilty to first degree murder"; and that on several occasions between July 13, 1942, and August 5, 1942, Mrs. Bates told her that she "need not worry about . . . defendant Lovelace, that the judge had promised he would not receive a death sentence."

Mrs. Bates, in affidavits filed on behalf of defendants, stated that defendant Lovelace informed her prior to the preliminary hearing "that he had made a complete confession to the police and had even taken them to the scene of the crime"; that she "did not state to John Norman Lovelace in April or May, 1942, or any member of his family that she had made an agreement with the District Attorney's office, the judge, and the sheriff's office whereby defendant would automatically be give_ a 'life sentence' "; that "at no time did either John Norman Lovelace or Cecil Lyle Gilbert express themselves as desiring a jury trial; that both said at different times and together that their best chance was before a Judge, and that they understood that there was legally no question as to their guilt"; that she "never stated 'Nothing can go wrong, it is already fixed, etc., or that defendant had to plead guilty.' That defendants never even seriously discussed the possibility of anything but a guilty plea with affiant"; that "neither defendant ever requested affiant to enter a Not Guilty plea or to try the case with a jury; that both had had experience in Courts and decided to enter a guilty plea and throw themselves upon the mercy of the Court because they believed that was the best chance for life. That affiant entered said guilty pleas because, she believed the Judge would temper justice with mercy and impose life sentences on both defendants. That affiant was just as stunned as *was* defendants at the

Judge's sentence"; that early in July, 1942, she discussed with Judge McKay, the trial judge, the charges against defendants and the sentences they might expect to receive from him; that "Judge McKay stated that he saw nothing unethical in the inquiry and that he would have no prejudice for or against a defendant; that of course *he could not commit himself to anything before he heard the evidence;* that he had never sentenced a man to death who did not fire the shot and that Judges were loath to inflict the extreme penalty on those not taking an active part in the crime. *That of course the evidence in this case might lead him to a totally different conclusion.* That affiant did convey to John Norman Lovelace and to members of his family the substance of this conversation and stated to all of them 'Now the Judge has promised nothing but he is not prejudiced and will not automatically inflict a death penalty because the victim was a police officer' " (italics added); that she never requested defendant Lovelace to plead guilty "or stated that he had no chance of getting more than life if he plead[ed] guilty. That she never stated to either defendant that 'all arrangedments had been made and that they would have to plead guilty in order that everything might be carried out according to schedule' "; that she had never used the word "guarantee" in discussing their probable sentences with defendants; that she "entered a plea of guilty in this case for both defendants, first, because she believed them to be guilty and the evidence so showed; second, because both defendants stated they believed that they would have a better chance for life with a Judge than with a jury; third, because the District Attorney's office had consented to a plea and stated that they would make no recommendation for the death sentence; fourth, that because of the humanitarian record of Judge McKay, affiant believed that he would not take the lives of these defendants"; that she "never stated [to defendant Lovelace] that anything was already fixed or that 'you have no chance of getting more than life if you plead guilty' . . . That on no occasion did she ever state that 'there was nothing to worry about', either to Mrs. Margaret Lovelace, or to any other person. That she did state to both defendants that Deputy District Attorney Veitch, after long conversations with the Acting Chief of Police, the Acting Sheriff, and the head of the robbery squad, had agreed that the District Attorney's office would remain

mute and make no demand for the death penalty. That she did explain on several occasions to both defendants and their relatives that if the case were tried the defendants would be found guilty on all four counts''; that she did state to both defendant Lovelace and his mother that ''in her conversation with Judge McKay, he had stated that he had never condemned a man to death who did not fire the shot and that Judges were loathe to inflict the extreme penalty on those not taking an active part in the crime, and that he could not imagine himself doing so; that affiant did believe that Judge McKay would grant to both defendants life sentences''; and that she ''always believed, as a result of her conversation with Judge McKay, that he would grant the defendants a life sentence, or she would have tried the case. That she communicated this belief to John Norman Lovelace and Lyle Cecil Gilbert. That had there been any doubt in the mind of affiant, she would have advised both defendants to go to trial.''

Arthur L. Veitch, Deputy District Attorney, who was assigned to prosecute these defendants, testified that prior to the entry of defendants' pleas of guilty he was informed by their attorney, Mrs. Bates, that she intended ''to plead her defendants guilty''; and that he stated to her that he would in that event ''have no statement to make [to the court] as to penalty unless the judge should request affiant to declare himself in that regard,'' but that if so requested he ''would be obliged to state to the court his true opinion'' which was that defendants should suffer the death penalty. The record shows that Mrs. Bates conveyed to defendants the substance of the above statements of Deputy District Attorney Veitch, but it shows also that he fully lived up to his declaration that unless requested by the court so to do he would make no recommendation concerning the penalty which defendants should suffer; indeed, when, immediately prior to the pronouncement of the judgments of death the court inquired, ''Is there anything you wish to say, Mr. Veitch?'' Mr. Veitch replied, ''No, I think the discussion should be confined as to whether or not there is any legal cause, at this time. I mean, I don't believe there should be any emotional appeal. We have our plain duty to do.''

Judge McKay, before whom both the original proceedings against these defendants and the hearing on the present motions were had and who pronounced both the judgments of

death and the modified sentences which are involved herein, also took the stand and in answer to questions propounded by the attorneys for defendants testified that he first became a judge of the superior court on November 12, 1941, after serving as a pro tempore judge the previous month; that prior to this case he had never, as superior court judge, presided at a murder trial; that the only conversation he had with Mrs. Bates out of open court relative to these defendants and prior to the time they were sentenced was on July 10, 1942, at which time Mrs. Bates merely announced her intention to plead defendants guilty; that at no time did he state to her that he never would sentence to death a man who had not fired the fatal shot; that his determination to sentence defendants to death was based to a considerable extent upon the testimony given at the Max Gilbert trial by victims who were present at the time of the crimes and had been assaulted and severely injured by defendants incident thereto. He testified further that the only time Mrs. Bates was present at the Max Gilbert trial and actively engaged in the examination of witnesses was when these two defendants were on the stand, and that at no time did she cross-examine any of the other witnesses. This conduct, it will be remembered, was in substantial conformity with the stipulation which was made and with the ruling of the trial court relating to it.

In addition to the factual matters above set forth it is noted that the trial judge, in making the order herein complained of, relied in part upon certain proceedings disclosed in the record and which are related in a written memorandum filed by him, from which the following statement is taken: "There is a substantial evidence from which the Court must conclude that a bargain or agreement was reached between the People of the State of California and the defendants through their counsel and upon which the defendants relied. This bargain is strongly evidenced by the fact that at the preliminary hearing of this case Deputy District Attorney Veitch announced that he would seek the death penalty for each of the defendants, and Mrs. Bates said to him that she would seek to convince him that since these defendants did not fire the fatal shot life imprisonment would be granted. Thereafter, conferences were held between Mr. Veitch and Mrs. Bates and Mr. Veitch telephoned to the Acting Chief of Police and the Captain in the Sheriff's office, and Mr. Veitch thereafter remained

silent at all times on the subject of the death penalty for Lyle Cecil Gilbert and John Norman Lovelace, and kept the bargain as agreed upon. The record in this case also indicates that Deputy District Attorney Veitch, although silent at all times on the subject of the death penalty so far as Lyle Cecil Gilbert and John Norman Lovelace were concerned, nevertheless urged the Court to impose the death penalty upon their co-conspirator Max Gilbert, whom the evidence in the case indicates was the least culpable of those on trial.

''This is further corroborated by the filing of an amended information charging prior convictions of felonies and the re-arraignment of the defendants upon such amended information, since, if the death penalty was to be pronounced there was no need to file an amended information charging prior convictions of felonies; this was only for the purpose of enhancing the penalty or giving the prison board further authority for an increased penalty other than the death penalty.

''By reason of these facts and circumstances the defendants were prevented by extrinsic fraud from having their day in court. . . .''

The finding that ''the defendants were promised that they would receive a life sentence . . . and that this promise was based upon acts and conduct on the part of *officers of the State* and of defense counsel'' does not specify who made the promise. We have examined the entire record in an effort to discover support for such finding and to ascertain whether the promise, if any, was made by a responsible officer or representative of the state. Perhaps the closest approach in the evidence to support for the conclusion that a material promise or representation was actually made by a responsible state officer is the averment in the affidavit of Attorney Bates that the trial judge stated to her before the pleas of guilty were entered ''that he had never sentenced a man to death who did not fire the shot and that Judges were loathe to inflict the extreme penalty on those not taking an active part in the crime.'' The making of this statement was denied by the trial judge in his testimony (it will be remembered that he stated, among other things, that prior to the Max Gilbert trial he had not, as a superior court judge, presided at any murder trial) but even if we assume in support of his orders that before making them his recollection was refreshed and that he (the

trial judge) is one of the "officers of the State" referred to in the finding, the statement attributed to him by Attorney Bates still falls short of constituting such a promise or representation as would afford a basis for the claim of extrinsic fraud or denial of due process of law, because, even if we assume that it would otherwise furnish sufficient ground for such claim, it was, according to the affidavit of Attorney Bates, preceded by the qualification that "of course he could not commit himself to anything before he heard the evidence" and was followed by the caution that "of course the evidence in this case might lead him to a totally different conclusion."

The evidence as to the participation of Deputy District Attorney Arthur Veitch in the asserted negotiations is simply to the effect, as hereinbefore related, that he discussed the matter with defense counsel and after conferences with various law enforcement officers stated that he would adduce all available material evidence but would remain mute insofar as recommending the death penalty was concerned unless the trial judge expressly asked for his opinion. The record discloses that with high fidelity to his office and to his personal integrity he lived up to the commitment which he had made. Certainly no act or representation on the part of the district attorney's office shown herein can be said to even savor of intentional fraud or overreaching.

The factual sequence that Mr. Veitch, at the preliminary hearing, had announced that he would seek the death penalty for each of the defendants, that defense counsel stated in reply that she would try to convince him that since these defendants had not fired the fatal shot they should receive life imprisonment rather than death sentences, that Mr. Veitch may have asked for the death penalty as to the defendant who stood trial (Max Gilbert, who was convicted on all four counts of the information), that he remained mute on the question of penalty as to these defendants who pleaded guilty, and that he filed an amended information charging these defendants with prior convictions of felonies, may well have been seized upon by these defendants as a basis for hope and belief that they would receive life imprisonment rather than the death sentence but such facts do not amount to a false or fraudulent promise or representation. Of course the defendants *hoped* that they would escape the supreme penalty; that was the purpose of their pleas. That also, apparently,

was the hope and purpose of their counsel. ▮ But hope or belief not founded on a false or fraudulent representation or promise does not constitute extrinsic fraud or denial of due process. It is apparent, as above shown, that there was no false or fraudulent representation or promise actually made by any responsible officer of the state to the defendants either for the purpose of tricking them into waiving trial and pleading guilty, or otherwise. There is not a vestige of evidence which would support the conclusion that any person concerned in this case wilfully sought to deprive the defendants of any legal right.

It is pointed out, however, that the evidence, although sharply conflicting, establishes for the purposes of this appeal that defendants' counsel represented to them, among other things (according to the affidavit of defendant Lovelace): that she "had reached an agreement with the district attorney's office . . . and the trial judge . . . whereby the four charges then pending . . . would be reduced to one charge of murder, and . . . [Lovelace] would automatically be given a life sentence"; that defendants "wouldn't get the death sentence if they pleaded guilty"; that the judge had told her that "he had never yet sentenced a man to death since he had been on the bench, which had been thirty-three years, who did not actually fire the fatal shot, and that he could not conceive of any circumstances in which he would do so"; that "we had nothing to worry about, to just go down there and plead"; (according to the testimony of defendant Lyle Cecil Gilbert): that the judge had said "he couldn't conceive of ever sentencing a man to death who was not the actual killer; and that . . . we would be guaranteed a life sentence . . . it is a sure thing"; (according to the testimony of Mrs. Kellogg, attorney for Max Gilbert): "I have it all fixed with the judge and the District Attorney. I went to see Judge William McKay . . . *I asked him what he would do if the defendants pleaded guilty* to murder in the first degree; that thereupon Judge William McKay said to me . . . that he had never sentenced a man to death unless that man had actually fired the shot . . . There is no question now about its being a gamble; it's a certain thing . . . You're guaranteed life before Judge McKay; . . . I can guarantee you that sentence if you plead guilty." (Italics added.)

It is also to be borne in mind that the defendant Lovelace stated in his affidavit that he "relied implicitly upon these representations and statements of the said Mrs. Bates but at times had doubts and felt that he was cutting his own throat by entering a plea of guilty . . . That because of the severity of the charges herein, and because this affiant knew in his own mind that it was possible that he might be sentenced to death, and for the purpose of saving his life, and believing implicitly in the said Mrs. Bates and her representations, he agreed to waive the jury and enter a plea of guilty to the murder charge herein, with the understanding at all times that he would be sentenced to a life sentence thereon." Concerning the asserted conversation with the judge one Bayard Lovelace, a brother of the defendant Lovelace, testified that Attorney Bates told him, " 'Now, he [the judge] can't make a written guarantee, obviously, but,' she said, 'that is as close as he can come,' and she said, 'We can rely on it.' "

Defendants have confided to us that they "have not been concerned with technicalities of procedure" and maintain that these are "proceedings under the Fourteenth Amendment to the Constitution of the United States," and that the trial court "determined that he had been the victim of fraud and concealment" and therefore the judgments of death were obtained without due process of law, were null and void, and could be set aside at any time. ■ The People, with more regard for established processes, classify the defendants' motions as constituting applications for relief in the nature of writs of error *coram nobis.* We are in accord with this classification. ■ Regardless of defendants' professed unconcern with "technicalities of procedure" the procedural rules of the courts are a part of the due process of law established in this state (see *People* v. *Cowan,* 44 Cal.App.2d 155, 162 [112 P.2d 62]) and must be observed in the interests of orderly functioning of the administration of justice. ■ Irrespective, however, of the character which may be attributed to the proceeding, it is at once apparent that the order appealed from cannot be sustained. The new judgments are necessarily void unless the original judgments were void, but if the original judgments were void then so also are the new judgments, because such new ones are based on the very same pleas which the trial court held were improperly entered. In other words, if the defendants' pleas are a nullity,

as was at least impliedly found by the trial court, then such pleas cannot be the basis for any valid judgment. If such pleas are in fact and in law void then they should be vacated and both the People and the defendants should be restored to their original positions in all four counts of the information as they stood immediately before the entry of such pleas. If the pleas are not void the original judgments must stand.

The People as well as the defendants have rights in this case. With the record showing the signed conclusion of the trial judge ''That the defendants and each of them were promised that they would receive a life sentence if they entered a plea of guilty . . . and that this constituted an agreement and bargain which *estopped* the State of California from imposing sentences of death in this case,'' certainly the trial judge who had signed that conclusion was not in a position properly to proceed upon those pleas to adjudicate the further rights of either the state or the defendants.

Although from what has already been said it is obvious that the order appealed from must be reversed and the new judgments expunged from the record, it is also apparent that the mere reversal of such order and expungement of the new judgments of life imprisonment will not necessarily determine all issues in the case. Although the motion made by the defendant Lyle Cecil Gilbert asked only for the vacation of the judgment of death his attack upon the proceedings, like that of his codefendant, actually challenged the validity of his plea of guilty and it is only such challenge which presents a serious problem. The attack upon the proceedings for the determination of the degree of the murder and the fixation of punishment merits little comment. It is apparent from the record and from the trial court's findings of fact that the only ''fraud and concealment'' practiced upon the court relating to the guilt of the defendants was that of the defendants themselves. Concerning this matter the court's finding (stated as a conclusion) is ''That the judgments are based upon perjured testimony *given by the defendants themselves, acting in reliance upon a promise that they would receive life sentences.*'' (Italics added.) Such finding does not commend itself as a basis for concluding that the defendants were the victims of extrinsic fraud or were denied due process of law. It is a novel thesis which invokes for a party the extraordinary remedy of *coram nobis* upon the ground that at

his trial the court was deceived as to material facts through the deliberately false testimony of the party himself. In *People* v. *Black,* 89 Cal.App. 219, 224 [264 P. 343], such an attempt was made and the court declared, ''While it is well settled that the writ of error *coram nobis* may be invoked to correct an error of fact upon a proper showing that the error was occasioned by duress or fraud, the writ cannot be invoked in a case in which the petitioner is a party to the fraud.''

Furthermore, the defendants admitted that substantially all of the testimony given by them at the trial of Max Gilbert and material to their own guilt was true. The subject matter of their asserted falsifications is hereinabove mentioned. Perusal of the record of the proceedings had at the fixing of the degree of the crime when the original judgments of death were pronounced, including the evidence then taken, the argument of counsel for the defense, and the remarks of the trial judge, tends strongly to negative any prejudice to either defendant by reason of their assertedly false testimony. From the record it does not appear that anything material which legitimately could have been done or said in behalf of the defendants in that proceeding was omitted by their counsel. Our opinion on the former appeal discloses that the evidence of claimed mitigating circumstances was then an issue. We held (p. 530 of 22 Cal.2d), ''As to the asserted mitigating circumstances attending the offenses of appellants, including the facts that appellant Gilbert, although armed at the time he was wounded by Officer Bunch did not return the fire, and that Lovelace was physically handicapped, youthful, and acting under the direction of the apparently more hardened and forceful Horgan, it is not under any advocated theory within our province to exercise original discretion in the premises. If we were to assume all that is urged by appellants with respect to our power of review, we could modify the judgments only if it appeared that the discretion of the trial court had been abused *as a matter of law* (see Cal. Const., art. VI, sec. 4). Whether we might on original consideration of the facts differ from the trial judge is therefore immaterial. The controlling point is that the evidence is not insufficient ás a matter of law to support the conclusions reached by the trial court.'' It is apparent from the record, and particularly from the remarks of the trial judge included therein, that the mitigating circumstances were considered but were not then deemed

sufficient to overcome the conflicting demands of society. The sentence of death, once pronounced, is a solemn judgment which cannot lightly be vacated or modified.

Likewise solemn is the procedure which may lead to such a judgment. Exacting as the state may be in ultimately bringing retribution to those who violate its highest laws, it is at least equally solicitous that those who are prosecuted shall be accorded full measure of every legal right. The state will not, through its courts, pronounce judgment on a plea which has been procured by fraud or duress or by any force which operates to preclude the exercise of free will and judgment by the party. Neither will it permit a scheming criminal to trifle with its processes. He may gamble only at his own risk on the result of a plea of guilty when that plea is entered through the exercise of his judgment unvitiated by fraud, duress, or similar motivating influence. If he claims such overreaching he must bear the burden of proof.

"The writ of error *coram nobis* is not intended to authorize any court to revise and review its opinions; but only to enable it to recall some adjudication made while some fact existed which, if before the court, would have prevented the rendition of the judgment, and which, without any fault or negligence of the party, was not presented to the court. 1 Freeman on Judgments, Sec. 94; 23 Cyc. 884." (*Nickels* v. *Florida*, 86 Fla. 208, 228 [98 So. 497, 502, 99 So. 121].) . The crucial question here is whether the pleas of guilty were valid. If facts existed which would vitiate the pleas, and which, without any fault or negligence of the defendants, were not presented to the court, then the defendants are entitled to have their pleas and the judgments vacated.

The findings of fact herein were evidently drawn with the view of modifying the original judgments but were not drawn in respect to all of the factual issues with which the court would have been concerned if a clear cut issue as to the validity of the defendants' pleas had been before it. We are, therefore, unable to determine satisfactorily upon this record that the pleas are either necessarily valid or necessarily invalid.

The record discloses evidence tending to show that the free will and judgment of one or both defendants were overreached by unjustified representations of their counsel seemingly corroborated by acts and statements of the court

and deputy district attorney. While it is true that mere advice or assurances by a private attorney will not vitiate a plea entered in reliance thereon (see *People* v. *Miller,* 114 Cal. 10, 16 [45 P. 986]; *In re Hough,* 24 Cal.2d 522, 531 [150 P.2d 448]; *People* v. *Gottlieb,* 25 Cal.App.2d 411, 415 [77 P.2d 489]) we are of the view that a contrary rule should prevail if the statements of the attorney amount to an unqualified factual representation (which is untrue) that the state or a responsible officer thereof, such as a judge of competent authority or a district attorney, has entered into a bargain purporting to commit the state to give the defendant a reward, in the form of immunity or a lesser punishment than he might otherwise receive, in exchange for a plea of guilty, where such representation is apparently substantially corroborated by acts or statements of a responsible state officer, is in good faith relied upon by the defendant, and actually operates to preclude the exercise of free will and judgment on the part of the defendant.

The most critical point is substantial deprivation of the exercise of the free will and judgment of the party through an act participated in by the state. Mere advice and persuasion or the expression of matters of opinion by his own attorney will not suffice to vitiate the plea. Neither will unwarranted or even wilfully false statements of factual matters by his attorney suffice. The private attorney is selected by the party and is his agent. But if the representation of the private attorney presents a purported commitment by a responsible state officer which if actually made would vitiate the plea and if the acts or statements of such state officer, although innocently done or made, apparently corroborate the representation, are in good faith and without negligence relied upon by the defendant, and in truth operate to prevent the exercise of his free will and judgment, then the state in its solicitude for fairness will not accept the benefit of a plea so given.

As previously stated the record contains evidence tending to show such a situation. It also contains evidence tending to negative some, if not all, of its elements.

The purposes and functions of the writ of error *coram nobis,* the situations in which it may properly be granted, and the relief available to defendants incident thereto, have frequently been considered by the appellate courts of this state,

and were extensively discussed in *People* v. *Reid,* 195 Cal. 249 [232 P. 457, 36 A.L.R. 1435]. (See, also, *People* v. *Bostic,* 167 Cal. 754, 760 [141 P. 380]; *People* v. *Mooney,* 178 Cal. 525, 528-530 [174 P. 325]; *People* v. *Schwarz,* 201 Cal. 309 [257 P. 71]; *People* v. *Campos,* 3 Cal. 2d 15 [43 P.2d 274]; *People* v. *Superior Court,* 4 Cal.2d 136, 149 [47 P.2d 724]; *People* v. *Lumbley,* 8 Cal.2d 752, 759-760 [68 P.2d 354]; *In re Hough, supra,* 24 Cal.2d 522, 531, 532; *People* v. *Perez,* 9 Cal.App. 265 [98 P. 870]; *People* v. *Blumen,* 87 Cal.App. 236, 241-242 [261 P. 1103]; *In re Sargen,* 135 Cal.App. 402, 406-407 [27 P.2d 407]; *People* v. *Vernon,* 9 Cal.App.2d 138, 140-141 [49 P.2d 326]; *People* v. *Lyle,* 21 Cal.App.2d 132, 136 [68 P.2d 378]; *People* v. *Superior Court,* 28 Cal.App.2d 442, 444-445 [82 P.2d 718]; *People* v. *Butterfield,* 37 Cal.App.2d 140, 142 [99 P.2d 310]; and annotations in 30 A.L.R. 686; 58 A.L.R. 1286.) ▇ It is our view, notwithstanding a dictum to the contrary in *People* v. *Reid, supra,* 195 Cal. at page 260, that the fact of affirmance of a judgment on appeal should not, in an otherwise proper case, preclude the granting of relief. (See annotation, 145 A.L.R. 818.)

▇ Defendants' contention that the People have no right of appeal from the order of the trial court setting aside or modifying its previous judgments of death is without merit. The question was before this court in *People* v. *Lumbley, supra,* 8 Cal.2d 752, 761, and was decided adversely to defendants' position. The effect of the order here appealed from was to modify substantially the judgments originally entered. Such an order, obviously, is one "made after judgment, affecting the substantial rights of the people" and is within the purview of section 1238(5) of the Penal Code. Implications to the contrary in the language used in *People* v. *Superior Court,* 4 Cal.2d 136, 151 [47 P.2d 724], are overruled.

For the reasons hereinabove expressed the order appealed from is reversed and the cause is remanded to the trial court with directions to expunge from its records the judgments pronounced on November 3, 1943, whereby the defendants purportedly were sentenced to life imprisonment, and to make such orders as are required by law for the execution of the judgments originally pronounced on August 5, 1942. This judgment of reversal of the order appealed from shall not preclude either defendant, if he be so advised, from applying

anew in the superior court for relief in the nature of a writ of error *coram nobis,* the proceedings, if any, to be in accord with the views hereinabove expressed.

EDMONDS, J.—I concur in the judgment of reversal but do not agree with my associates that if the representation of the attorney for the defendant in a criminal prosecution includes a purported commitment by a responsible state officer which, if actually made, would vitiate the plea of guilty, and if the acts or statements of such state officer, although innocently done or made, apparently substantially corroborate the representation, and are in good faith and without negligence relied upon by the defendant, and in truth operate to prevent the exercise of his free will and judgment, the plea may be challenged as having been improperly induced. This rule is an entirely new one and, in my opinion, it will provide the means whereby unjustified attacks may be successfully made upon pleas accepted by courts in good faith and judgments which have become final.

Under the rule now laid down, the plea may be set aside upon the sole ground that although no promise or representation was made by the trial judge or other responsible officer, the act or statement of one or both of them innocently made appear to corroborate the misrepresentation made by the defendant's counsel. It would seem that this novel innovation in the criminal law should require that at least one of the corroborating circumstances should unequivocally justify a conclusion by the accused that an agreement as to the punishment to be imposed had been arranged in his behalf with the state. If, as in the present case, one convicted of a crime may escape judgment and have his plea of guilty set aside merely because there were acts or statements innocently made by an official of the state which might or might not corroborate a representation by counsel, the finality of the judgment in a criminal case will depend largely upon uncertain circumstances which, although innocently occurring, may be claimed to have been relied upon as evidencing the existence of a promise made by the state.

But even if it be assumed that the new rule should be added to the criminal law, the facts of the present case, in my opinion, conclusively show the lack of two essential elements which prevent its application to relieve the defendants. Certainly

there is no substantial evidence whatever justifying a finding that either Gilbert or Lovelace in good faith relied upon the asserted representations of their attorney, and there is much evidence directly tending to show that each of the defendants in pleading guilty exercised his free will and independent judgment.

Neither of the defendants was a novice in crime or court procedure. Gilbert had suffered four prior convictions, Lovelace one. Gilbert's sophistication is evidenced in his testimony on the motion, as follows: ''And I want that thoroughly understood now, that at no time would I ever consider any plea of any kind whatsoever, in any shape, if I hadn't had a guarantee; and I thought I took all precautions necessary without a signed statement by all parties involved. With the exception of that, I thought I had taken all the necessary precautions. That's why I was willing to even go to trial with a public defender. I didn't want no part of the plea until I actually got a guarantee and, as Mrs. Bates said, 'I have the Judge's word for it that you will get life.' ''

The same defendant, in relating a conversation assertedly had with Mrs. Bates relative to the charges of prior convictions, testified: ''Also at that time I says, 'I'll admit one prior, but as far as the other priors are concerned I can't admit them.' And she says, 'Why not?' At that time I also told her that, if I remember right, Section 642 to 646 of the Penal Code covered prior convictions. I also told her what these prior convictions were, and that the Penal Code, to my knowledge, stated very definitely that in order for it to be a prior conviction that it must be a separate information filed and that you had served time on each individual charge, to be a prior. I explained to her that instead of these four it actually was one. I says, 'On those conditions I will admit one prior; otherwise I will deny them all.' And she says, 'Well, that's Mr. Veitch's idea of making you serve more time.' ''

It does not seem likely that a person who so advised his attorney was misled by her. Furthermore, one of the criticisms now leveled at Mrs. Bates is that, at the trial of Max Gilbert, she did not cross-examine prosecution witnesses but instead advised the defendants not to antagonize them. The fact that the defendants were so greatly interested in the testimony being given at that time clearly shows that neither they nor their counsel then considered that they had any

agreement as to the sentences which might be pronounced, and very certainly were not relying upon any commitment made by the district attorney.

Also, according to the rule now promulgated, reliance upon an asserted representation must be without negligence on the part of the defendant. In the present case, upon the hearing for the purpose of taking evidence to fix the degree of the crime to which Gilbert and Lovelace had pleaded guilty, the trial judge read a prepared statement in which he announced his intention to impose a sentence of death upon each of them. Certainly, if either of the defendants had pleaded guilty upon the inducement now stated by them, it is reasonable to suppose that one or both of them at that time would have asked permission to change his plea. If the law is to afford relief upon the narrow ground that acts or statements innocently made by the prosecuting officer or the trial judge might reasonably be considered by a defendant as corroboration of representations assertedly made by his counsel, not later than the time of sentence he should be required to disclose the circumstances claimed to have been relied upon by him in pleading guilty.

For these reasons, in my judgment, the order appealed from should be reversed without the qualification that either defendant may apply anew for relief in the nature of a writ of *coram nobis.*