[Crim. No. 4318.   Second Dist., Div. Three.   May 11, 1949.]

THE PEOPLE, Respondent, v. JEROME ODLUM, Appellant.

William Strong for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, William E. Simpson, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

VALLÉE, J.—Appeal from an order denying a motion to vacate a judgment and sentence. While the motion is denominated as stated, we construe it to be also a motion to vacate a plea of guilty.

Defendant was charged by information with four counts of issuing checks without sufficient funds, felonies, and a prior conviction of forgery, a felony, in Minnesota, and serving a term therefor in the state prison. He pleaded not guilty to each count and admitted the prior conviction.

On December 18, 1947, the date of trial, the following proceedings took place: "THE COURT: People against Jerome Odlum. MR. MOST: [Attorney for defendant] At this time, your Honor, the defendant wishes to withdraw his plea of not guilty. THE COURT: To four counts or one? MR. MOST: We will just enter a plea as to one count. THE COURT: Is that satisfactory to the people? MR. CRAIL: Satisfactory. THE COURT: Mr. Odlum do you want to plead guilty to Count 1? THE DEFENDANT: Yes. THE COURT: You are doing that because you are guilty and for no other reason? THE DEFENDANT: Yes. THE COURT: Nobody has forced you to do it? THE DEFENDANT: No. THE COURT: Has anyone made you any promise of immunity or given you any hope of reward for doing it? THE DEFENDANT: No, sir. THE COURT: Permission will be granted to withdraw the plea. You may rearraign the defendant. MR. CRAIL: To the offense of issuing checks without sufficient funds, a felony, as set forth in Count 1 of the information, how do you plead, guilty or not guilty? THE DEFENDANT: Guilty. MR. CRAIL: To the charge of having suffered two prior convictions [defendant had suffered and admitted one prior conviction only], one being for forgery in Minnesota—THE COURT: That has been admitted heretofore. MR. CRAIL: Oh, pardon me. MR. MOST: Yes. At this time, your Honor, we would like to ask permission to file application for probation. THE COURT: Do you waive time for sentence? THE DEFENDANT: Yes. THE COURT: Permission will be granted and the matter is ordered continued until January 21st, 1948, at nine o'clock a. m. for further proceedings." January 21, 1948, appellant was sentenced to imprisonment in the state prison. The other counts of the information were dismissed.

September 27, 1948, appellant, by a different attorney, filed a "Motion To Vacate Judgment and Sentence." The motion was based upon the grounds (1) That the free will and judg-

ment of the defendant were overreached by certain untrue representations made to him by his then attorney, viz., to the effect that the trial court had agreed to impose only a short jail sentence with a possible fine if defendant would enter a plea of guilty to count one of the information; and that such untrue representations were seemingly corroborated by the acts and omissions of responsible representatives of the People; (2) That the defendant believed and relied on such representations and such seemingly corroborative acts and omissions and that but for this he would not have waived his right to a trial and would not have entered a plea of guilty to count one; (3) That by reason of said representations and seemingly corroborative circumstances he was deprived of the right to present certain material evidence in connection with the fixing of punishment; (4) That none of said matters appear of record; (5) That he was deprived of due process of law under the federal and state Constitutions; (6) That he had a good and valid defense to count one of the information. In support of the motion appellant filed his affidavit, a supplemental affidavit, and one of Manning Post, his employer. In opposition there were filed two affidavits of Louis Most, appellant's former attorney, and one of Clifford Crail, deputy district attorney.

Appellant's affidavit stated that: In the second week of December, 1947, his attorney, Louis Most, told him he had had a long conversation with the trial judge and had explained to him in full detail "every aspect" of his case, including his "background as a newspaper reporter, editor, novelist and screen writer," his domestic troubles, his resultant "rather heavy" drinking, his effort, since his arrest, to straighten out his affairs by going back to work as a screen writer at a major studio, and the fact that his employer desired to assign him on a new picture, which assignment would not be made unless he was assured that appellant "would not be sent to State's Prison." His attorney then stated that the judge replied: "It appears that the problem of this man is largely financial. What he needs is some kind of business management. He is probably more irresponsible than criminal. However, on account of his past conviction he is not eligible for probation, but I can reduce this to a misdemeanor and give him a short sentence in the County Jail, if he wants to enter a plea of guilty to one of the Counts in the information and the other three will be automatically dismissed, but as a condition to all of this, I want

to be sure his affairs are so arranged that he will have this matter constantly before him. He doesn't seem to realize the value of money. If I do this I'm going to require that he employ a business management firm to handle all of his money. I don't want him to make restitution of all these checks directly, but I want it done by way of deduction from his weekly earnings. He is to have no further checking accounts, but all of his money must be handled by the business management firm. They will pay his bills and arrange to make gradual restitution of these checks so that until they are paid he will have a smaller weekly drawing account to impress upon his mind that money has value. If he wants to do it this way, I will not sent him to San Quentin, but I will give him thirty to sixty days in the County Jail and probably a fine.'' Thereafter, appellant's counsel repeatedly assured him there ''was a definite agreement and understanding'' with the judge ''that if affiant would promise to follow the aforesaid recommendations of the said judge that the said judge would not sentence affiant to San Quentin but would impose a short-term County Jail sentence and possibly a fine, in which case he would grant a stay of execution to the affiant in order that affiant might complete the assignment as a writer on the proposed motion picture,'' and that the judge's proposal ''was the only sensible way out of an impossible situation'' since the trial judge had stated that appellant would have no chance in a jury trial because of his previous conviction. On December 15, 1947, his attorney told him he had informed Manning Post, appellant's employer, of the agreement with the judge. Appellant, pursuant to the representations of his attorney, employed a business management firm recommended by his attorney. Four days before sentence was to be pronounced, appellant borrowed $1,300 with which to make restitution, believing that such act would present him to the court in a more favorable light; and at the time of pronouncement of judgment and sentence he had that sum in his possession, informing his attorney of this fact, and told his attorney that he desired to make restitution. He was told by his attorney ''not to do this as it would be contrary to the recommendation of and arrangement with the trial judge.'' Although appellant knew he was not eligible for probation under the laws of California because of his previous conviction, nevertheless his attorney told him that he would apply for probation ''for the purpose of working out with the probation officer the matter of restitu-

tion and the handling of affiant's affairs by a business management firm to insure that the recommendations of the court would be carried out." When, after his plea, his attorney applied for permission to file an application for probation, he believed that the granting of such permission "corroborated the aforesaid representation" of his attorney. When, at the time of the entry of his plea, appellant heard the deputy district attorney state that appellant had admitted "two" previous convictions of felonies, he immediately spoke to his attorney, who replied, "It's unimportant, it is all arranged anyway, you have nothing to worry about. Don't you see everything is working out just like I told you. We will work out a deal with the probation officer so that the judge will know that his requirements will be performed." The affidavit further states that since the statement "with respect to two previous convictions (when in fact there had only been one) was treated as a matter of no significance [it] seemed in the mind of the affiant to corroborate the purported agreement that the said offense was to be dealt with as a misdemeanor." If the representations had not been made and the circumstances had not appeared to corroborate the representations, appellant would not have waived his right to trial. After sentence was pronounced Mr. Most was paid $150 as his fee.

In his supplemental affidavit appellant stated that all of the representations made to him by his attorney were untrue "insofar as they relate to any alleged promises upon the part of the judge" but at the time he changed his plea and thereafter he believed the representations to be true and "in reliance thereon and not otherwise" he changed his plea.

Manning Post, a motion picture producer and employer of appellant, stated in his affidavit that in the early part of December, 1947, he desired to assign appellant as a writer to a picture which was then in the course of preparation for production. Not wishing to sustain loss by assigning another writer to the picture in the event appellant would be unable to carry through "the entire course of preparation of approximately two months," he spoke to Louis Most, attorney for appellant, on several occasions between December 5 and December 15, 1947. Mr. Most told him he need not worry about assigning appellant to the proposed new picture because he had made "an agreement" with the trial judge that appellant, provided he entered a plea of guilty, would not be sent to San Quentin under any circumstances but "would be given a short jail sentence and possibly a fine," and that

he had a "definite understanding with and a definite promise from" the judge that in the event a jail sentence was imposed appellant would be granted a stay of execution until such time as the picture could be completed. In reliance thereon, he assigned appellant to the new picture on January 7, 1948. Immediately prior to the assignment and "on or about the first week of January, 1947," he had an additional telephone conversation with appellant's attorney, at which time the attorney stated that "everything was going according to plan and that he need have no fear of the defendant's being sentenced to San Quentin or receiving any kind of sentence other than a short term in the County Jail with a possible fine."

Clifford Crail, the deputy district attorney in charge of the prosecution of appellant, stated in his affidavit that the only agreement he had with appellant's attorney was that he would "recommend to the court that the court accept a plea of guilty to one count in the Information," and denied the making of any other agreement.

Louis Most, in his affidavit of October 19, 1948, stated that on December 15, 1947, he saw the trial judge in chambers and discussed the case with him, telling him that appellant was then working conscientiously on a good job, that he had been sober, and that he believed that appellant's full rehabilitation would result if the judge "would consider a County jail sentence rather than a sentence to San Quentin." The judge replied that in view of the fact appellant had a previous criminal record he did not "know" that he was eligible for a county jail sentence, but assured him that he would keep an open mind on the subject and be guided by the probation report. That was the extent of his conversation with the judge. No promises of any kind were made by the judge or the deputy district attorney on the case. In relating this conversation with the judge to appellant he told him: "We both know that you do not have any defense to the issuing checks without funds; if you change your plea to 'guilty' on one count on the 18th of December, 1947, we will ask for leave to file an Application for Probation, and I am sure that the Probation Officer's report will show that you have been thoroughly rehabilitated and are now holding down a responsible position. That you intend to pay all the people defrauded by reason of the issuing of the checks." He denied he ever told appellant "that he would serve only a short County Jail sentence" and stated that he said: "If you have

a good Probation Report, you will be very lucky if you receive only a County Jail sentence; we can only hope for the best. I am worried about those prior convictions as that usually counts heavily against you.''

In his affidavit of October 28, 1948, Mr. Most stated that Manning Post, appellant's employer, telephoned him on December 16, 1947, concerning the status of appellant's case; that he told him he had talked to the judge, who said he would keep an open mind on the subject of probation and if an application for probation was filed he would study the application ''very carefully and give Mr. Odlum everything to which he is entitled.'' He stated that he told Post that appellant would be very fortunate ''if he came out with six months to a year County Jail sentence, as part of his probation.'' He further stated that he never, at any time, stated to Post that appellant would not be sent to San Quentin. He denied that he had been paid any fee.

The motion came on to be heard October 29, 1948. At the hearing appellant testified that he was familiar with the contents of the affidavit of Manning Post and that Mr. Post told him ''of the statements that were made to him by Mr. Most.'' As to the statement in the affidavit of Mr. Most that he had received no fee at all, appellant introduced a telegram in evidence for the purpose of showing that Mr. Most actually received $150. The district attorney then stated: ''As far as the People are concerned our affidavits have been filed and the matter is now submitted on the affidavits on both sides, your Honor.'' The attorney for appellant stated: ''We are not making any claim that Mr. Crail was a party in any way at all to the agreement or promises,'' and stipulated that, ''no public official made any promises of any kind to the defendant.'' The district attorney then read into the record the proceedings had on December 18, 1947, which we have quoted *supra*. Argument ensued. The court intimated that appellant should have spoken up at the time of sentence or during the period of three months that he was in the county jail before transfer to San Quentin. The following then occurred: ''MR. ALLEN: [Attorney for defendant] May I interrupt just a moment? In summing up a moment ago I asked whether there was a question in your Honor's mind as to whether this offer had been timely made. I make an offer of proof at this time to show why. The defendant was trying to get this motion made all the time he was down here in jail. After he was sent to San Quentin he tried numerous lawyers

and nobody would accept it, because corroborative material was not at that time available, and I want your Honor to know why it was not available. THE COURT: The point, Mr. Allen, is this. Right there at the time that he was sentenced was the time for him to say 'If the court please, this attorney of mine has told me that he and the District Attorney agreed that I would get a county jail sentence.' MR. ALLEN: If your Honor please, that is exactly what happened in Judge McKay's court and it was subsequently, a long time subsequently, even after an appeal, that the matter was presented. THE COURT: As to the Gilbert case [*People* v. *Gilbert*, 25 Cal.2d 422 (154 P.2d 657)], there are several differences between that case and this one. For example, I believe that the court in fixing the sentence asked the District Attorney if he had any recommendation to make and the District Attorney there said, 'I will leave it to your Honor,' or remained mute. I don't remember exactly what the facts were. MR. ALLEN: I think he stood mute. THE COURT: Yes, but the court did ask for a recommendation. In this case there wasn't any statement made by Mr. Crail either way. There wasn't any information asked of Mr. Crail. MR. ALLEN: No, and there was none asked of the District Attorney in the other case. MR. SULLIVAN: [Deputy District Attorney] Your Honor, you asked the defendant if anybody had made any promises. THE COURT: Certainly I did. MR. ALLEN: Your Honor, that is admitted, and certainly it must have been the same thing in the Gilbert case and here a man was expected to say 'Why, certainly, my attorney said you promised this and that.' THE COURT: Not only is it admitted, Mr. Allen, that the court asked him that question, but it is admitted by affidavits that neither Mr. Crail nor the court did or intended to do anything which would make the defendant believe any representations had been made. (Further argument.) THE COURT: You still get back to the legal proposition, Mr. Allen, that when a man employs counsel he can't depend upon the fraud of that counsel to set aside a judgment such as this. After all, it would be opening the gates to all of these people who come in here and present this motion to make this same representation. The motion to vacate and set aside the judgment and sentence is denied. MR. ALLEN: May I ask the court if the court would make findings with respect to the allegations in the affidavits, and on the propositions of law involved? THE COURT: I don't think it is necessary for the court to make

any findings, Mr. Allen. MR. ALLEN: No, there is nothing that requires is. THE COURT: No, as I stated before. MR. ALLEN: But your Honor does feel, however, that the representations were made substantially as set forth? THE COURT: I make no finding on the allegations whatsoever. This is a motion to set aside a judgment on the grounds set forth and the motion is denied. MR. SULLIVAN: And the defendant remanded? THE COURT: The defendant is ordered remanded to the custody of the Sheriff of Los Angeles County to be by him delivered back to the Director of Corrections at San Quentin penitentiary. MR. ALLEN: Would your Honor hear the defendant for about two minutes? THE COURT: Mr. Allen, it is just a matter of appealing to sympathy. My hands are tied. There is nothing that I can do. There isn't a thing in the world I can do, Mr. Allen. I have no jurisdiction whatsoever in the matter.''

■ The motion was an application for relief in the nature of a writ of error *coram nobis*. (*People* v. *Gilbert*, 25 Cal.2d 422, 439 [154 P.2d 657].) The motion was not heard or decided on the merits. ■ It appears that the learned trial judge misconceived the effect of the decision of the Supreme Court in *People* v. *Gilbert, supra*. He proceeded on the theory ''that when a man employs counsel he can't depend upon the fraud of that counsel to set aside a judgment such as this,'' which is directly contrary to the holding of the Gilbert case. The trial judge concluded that because the ground of the motion was fraud of appellant's attorney, he could not act and that he had ''no jurisdiction whatsoever in the matter.'' The attorney general conceded at the oral argument before this court that the court had jurisdiction to hear and determine the motion on the merits.

*People* v. *Gilbert*, 25 Cal.2d 422 [154 P.2d 657] was an appeal from an order modifying to life imprisonment judgments imposing the death penalty for murder. One of the claims of the defendants was that their pleas of guilty had been procured by fraud of their own attorney. The facts were similar to those in the case at bar. The Supreme Court unequivocally held, pages 442, 443: ''The state will not, through its courts, pronounce judgment on a plea which has been procured by fraud or duress or by any force which operates to preclude the exercise of free will and judgment by the party. . . . If facts existed which would vitiate the pleas, and which, without any fault or negligence of the defendants, were not presented to the court, then the defend-

ants are entitled to have their pleas and the judgments vacated. . . . The record discloses evidence tending to show that the free will and judgment of one or both defendants were overreached by unjustified representations of their counsel seemingly corroborated by acts and statements of the court and deputy district attorney. While it is true that mere advice or assurances by a private attorney will not vitiate a plea entered in reliance thereon (see, *People* v. *Miller*, 114 Cal. 10, 16 [45 P. 986]; *In re Hough*, 24 Cal.2d 522, 531 [150 P. 2d 448]; *People* v. *Gottlieb*, 25 Cal.App.2d 411, 415 [77 P.2d 489]) we are of the view that a contrary rule should prevail if the statements of the attorney amount to an unqualified factual representation (which is untrue) that the state or a responsible officer thereof, such as a judge of competent authority or a district attorney, has entered into a bargain purporting to commit the state to give the defendant a reward, in the form of immunity or a lesser punishment than he might otherwise receive, in exchange for a plea of guilty, where such representation is apparently substantially corroborated by acts or statements of a responsible state officer, is in good faith relied upon by the defendant, and actually operates to preclude the exercise of free will and judgment on the part of the defendant. The most critical point is substantial deprivation of the exercise of the free will and judgment of the party through an act participated in by the state. Mere advice and persuasion or the expression of matters of opinion by his own attorney will not suffice to vitiate the plea. Neither will unwarranted or even wilfully false statements of factual matters by his attorney suffice. The private attorney is selected by the party and is his agent. But if the representation of the private attorney presents a purported commitment by a responsible state officer which if actually made would vitiate the plea and if the acts or statements of such state officer, although innocently done or made, apparently corroborate the representation, are in good faith and without negligence relied on by the defendant, and in truth operate to prevent the exercise of his free will and judgment, then the state in its solicitude for fairness will not accept the benefit of a plea so given." The order was reversed because the trial court had set aside the judgments without setting aside the pleas of guilty. The defendants were permitted to apply "anew in the superior court for relief in the nature of a writ of error *coram nobis*."

The record here presents just such a case. ▮ We as-

sume, as we must for the purposes of this appeal under the circumstances narrated, that the averments in the affidavits filed in support of the motion are true. Determination of the conflict in the affidavits will be for the trial court on a hearing of the motion on the merits. ▇ The statements of Attorney Most, as set forth in the affidavits of appellant and Manning Post, amount to an unqualified factual representation (which is untrue) that a responsible officer of the state, the judge who was to impose sentence on appellant, had entered into a bargain purporting to commit the state to give him a reward in the form of a lesser punishment than he might otherwise receive in exchange for a plea of guilty. The representation was unconsciously and innocently seemingly corroborated by acts and statements of the judge and the deputy district attorney. Appellant was permitted to plead guilty to only one count. Although ineligible to probation he was permitted to file an application for probation. After the plea he was allowed liberty on $1,000 bail. It is averred that the false representations and the corroborative acts and statements were in good faith relied upon by appellant and actually operated to preclude the exercise of free will and judgment on his part.

Appellant was not permitted to prove why he had delayed in filing the motion. He was entitled to establish, if he could, that the delay in not presenting the matter to the court was without any fault or negligence on his part.

▇ Counsel for appellant at the oral argument suggested that this court should vacate the judgment and the plea of guilty and direct the superior court to permit appellant to enter a plea of not guilty. Our power is limited to review. It is for the superior court, after a hearing on the merits, to determine whether the judgment and plea of guilty should be vacated. If the plea of guilty is in fact and in law void it should be vacated, and both the People and the appellant should be restored to their original position in all four counts of the information as they stood immediately before entry of such plea. (*People* v. *Gilbert*, 25 Cal.2d 422, 440 [154 P.2d 657].)

Order reversed.

Shinn, P. J., and Wood, J., concurred.

A petition for a rehearing was denied May 20, 1949, and respondent's petition for a hearing by the Supreme Court was denied June 9, 1949. Edmonds, J., and Spence, J., voted for a hearing.