DALE EUGENE SOLLARS, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 3953

October 18, 1957                    316 P.2d 917

(Petition for rehearing denied December 19, 1957.)
See 73 Nev. 343, 319 P.2d 139 for opinion.

*John W. Bonner,* of Las Vegas, for Appellant.

*Harvey Dickerson,* Attorney General, of Carson City;
and *George M. Dickerson,* District Attorney, Clark
County, for Respondent.

## OPINION

By the Court, MERRILL, J.:

This is an appeal from judgment of conviction of murder in the first degree under which, pursuant to jury

verdict, the appellant has been sentenced to life imprisonment. The defense interposed was that of insanity. The appeal comes to us upon four assignments of error. The first relates to our definition of insanity as a defense in a criminal action.

This court in 1889 in the case of State v. Lewis, 20 Nev. 333, 350, 22 P. 241, 247, approved and adopted the "right-and-wrong" test patterned after the M'Naghten rules pronounced by English judges in 1843. "To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong."

Appellant attacks this test as unjust, unrealistic, scientifically false, and out-moded. In the court below he objected to jury instructions incorporating this test and to instructions, also approved in State v. Lewis, supra, and patterned after the M'Naghten rules, defining insane delusions and establishing the conditions under which they may constitute a defense. In place of these instructions he proposed what has come to be called "the irresistible impulse" test as an alternative to the right-and-wrong test. The following instruction was offered: "You are instructed that in cases of delusional insanity, there is no legal responsibility either where there is no capacity to distinguish between right and wrong, as applied to the particular act, or where, even though there is such a capacity, if by duress of mental disease, he has so far lost power to choose between right and wrong as not to avoid doing the act in question, so that his free agency at the time was destroyed, and at the same time the alleged crime was so connected with the delusion in the relation of cause and effect as to have been solely the product of them." This instruction was refused by the trial court as an erroneous statement of the law. Appellant assigns as error the giving of

instructions following the M'Naghten rules and State v. Lewis and the refusal to give his proposed instruction on irresistible impulse.

The M'Naghten right-and-wrong test has been criticized from the time of its announcement. In 1869 the New Hampshire Supreme Court in State v. Pike, 49 N.H. 399, 6 Am.Rep. 533, rejected the test and provided instead that an accused is not to be held criminally responsible if his unlawful act was the result of mental disease or mental defect. Under this decision insanity was not defined as a matter of law, but in effect was made a question of fact to be determined by the jury as any other fact would be determined.

Notwithstanding criticism, the M'Naghten rules have received widespread approval in the courts of England and the United States. Not until 1954 did the New Hampshire rule receive recognition from the courts of other jurisdictions. In that year the United States Court of Appeals for the District of Columbia in Durham v. The United States, 94 U.S.App. D. C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, adopted the New Hampshire rule in substance. The Durham decision has been applauded by the psychiatric profession and has received approval in many articles, notes and comments in the law journals. The courts remain slow to follow and more reluctant to approve.

These developments, however, have led us to the conclusion that the right-and-wrong test approved in State v. Lewis should be reexamined. Counsel in this case and in Fox v. State (opinion handed down this day), 73 Nev. 241, 316 P.2d 924, were advised to this effect and have, through carefully prepared briefs, greatly assisted this court in its study of the problem. As a result of our study we have in this case rejected the irresistible impulse test. In Fox v. State we have considered and rejected the so-called theory of diminished or partial responsibility. The right-and-wrong test has been retained.

Criticism of the M'Naghten test is directed not only to the definition set forth but to a great extent is directed

to the fact that the definition is set forth by rule: a rule by which juries must be bound and to which the testimony of experts must be directed. Judge Sobeloff, writing in 41 Am. Bar Assn. Journ. 793, 794, states: "We know today that the external manifestations of mental disease follow no neat pattern permitting pat legal definitions suitable for universal application. * * * There is nothing more futile than the search for an absolute test as a matter of law; for it is a scientific fact, which has passed into common knowledge, that no such single test exists. * * * The weight to be assigned to a single phenomenon is not to be determined by a rule of law but in a factual judgment." He quotes from Professor Whitehorn of the Johns Hopkins Medical School to this effect (p. 795): "Psychiatrists are challenged to set forth a crystal-clear statement of what constitutes insanity. It is impossible to express this adequately in words alone, since such diagnostic judgments involve clinical skill and experience which cannot wholly be verbalized."

But verbalization is necessary, even if difficult, if enlightenment is to be communicated to a jury. Likewise a definition is necessary. "Insanity" and "sound mind" are terms used by statute. NRS 193.210 and 194.010. This court, then, must continue to recognize the statutory concept of "insanity" as the basis for relief from criminal responsibility. The term must be given meaning and significance if a jury is to be able to find such a condition to exist.

In criminal law "insanity", by whatever test it may be ascertained, may be said to be that *degree or quantity* of mental disorder which relieves one of the criminal responsibility for his actions. The existence of mental disorder may well be a fact. The weight to be assigned to any single phenomenon may well be a factual problem. It is quite another thing, however, to qualify as factual the determination that a certain state of disorder *ought* to relieve one from responsibility. This is moral, not

factual, judgment. This is a determination which, to insure universal application in accordance with the principles of government under law, has been given expression in rules of law. The supporters of the Durham test contend that this judgment properly should be left to the jury in each individual criminal trial, uncontrolled by any rule of law.

It is universally recognized, however, that not every mental disorder should be regarded as sufficient to relieve one from criminal responsibility. So long as this be true it must be recognized that there are limits which may, in the public interest, be validly imposed upon the area within which the judgment of the jury and the psychiatrists can operate. In the interest of uniform administration of criminal justice it may reasonably be contended that these limits should be fixed as best they can and thus be made applicable in all cases.

To leave "insanity" undefined would be to eliminate the entire statutory concept of insanity as the limited and uniform basis for relief from criminal accountability. It would substitute in its place a jury power of moral judgment unlimited by those very bounds which statute law contemplates and based solely upon the conscience and common sense of 12 persons. Such a sweeping change of approach, in disregard of limits and conditions contemplated by statute, is, we feel, beyond the reach of the judicial function as that function is recognized in this state.

In our view, therefore, the problem with which psychiatry and the law both are struggling should be judicially attacked, not upon the basis of an abandonment of rule of law through abandonment of definition, but upon the basis of agreement upon a test under which both law and psychiatry can best operate.

We turn to the question whether the right-and-wrong test should be modified by incorporating with it as an alternative the so-called "irresistible impulse" test. Upon this question we have concluded that we must

reject the proposed extension of the right-and-wrong test for the reason that it cannot be said to reflect the current enlightened public conviction.

Among the psychiatrists themselves there is much doubt as to the validity of the concept of irresistible impulse in the sense of a loss of volitional control through mental disorder which does not necessarily affect the intellectual powers of the defendant. In other words, the psychiatrists as a group apparently are not agreed that the urge to commit an act which one knows to be wrong can, through mental disorder, become irresistible. In the view of one substantial faction the intellect and the will cannot thus be disassociated. Journ. of Cr. Law, Criminology and Police Science, Vol. 46, Nov.-Dec. 1955, p. 463, "Responsibility." Dr. Cavanagh states in "A Psychiatrist Looks At The Durham Decision," 5 Catholic Univ. of Am. Law. Rev. 25, 46, "The will is indirectly influenced by the emotions and unconscious factors, but never coerced."

The definition of insanity advocated by the appellant is taken from language found in Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193, decided in 1887. In upholding the validity of the irresistible impulse test that court states, p. 859, "there must be two constituent elements of legal responsibility in the commission of every crime * * * (1) capacity of intellectual discrimination; and (2) freedom of will." A distinction between cognition and volition as separate compartments of the mind was, perhaps, the accepted opinion of psychiatrists at the time that opinion was written. Today, however, it is almost universally agreed that the mind is not capable of being compartmentalized. The will, intellect and emotions are considered to be interdependent, integrated one with the other, so that mental illness or disorder cannot have an isolated effect.

Further, there is doubt among the psychiatrists as to their ability to distinguish between those cases where lack of volitional control is properly attributable to mental illness and those where it is due simply to a failure to resist that which could have been resisted had

the power to resist been exercised. Guttmacher, 46 Journ. of Cr. Law, Criminology and Police Science, supra, pp. 463, 466.

Furthermore, it is felt that to recognize the irresistible impulse test as an independent test of insanity without specific limitation, is to make the defense of insanity available to psycopaths and neurotics who ought not to be freed from accountability for their actions.

The result of what would appear to be several sources of doubt is summed up in this statement by Dr. Guttmacher, 46 Journ. of Cr. Law, Criminology and Police Science, supra, p. 466. "One of the questions asked the members of the American Psychiatric Association was: 'Do you believe the concept of the irresistible impulse is psychiatrically and legally sound?' Of the three hundred and fifty who answered, sixty percent answered in the negative and forty percent in the affirmative." Professor Jerome Hall in his recent article in 42 Am. Bar. Assn. Journ., 917 ed. 985, states "* * * psychiatrists are sharply divided on this question, and * * * some of the most distinguished of them vigorously oppose the irresistible impulse theory."

This difference of opinion alone would seem to administer the coup de grace to the irresistible impulse test. With all the opposition to M'Naghten we must yet adhere to it until a rule can be substituted which more accurately reflects current scientific knowledge. We can hardly recognize as scientific truth a rule which has failed to receive the approval of what we may regard as the most enlightened segment of society in this field of knowledge.

We conclude that the trial court did not err in refusing the instruction incorporating the irresistible impulse test and in relying upon the rules approved in State v. Lewis, supra.

The next ground of appeal is that the trial court improperly permitted the jury to separate during the course of the trial. Upon this ground we have concluded that a reversal is required.

Sollars, a young veteran of military service, with a

background of mental disorder and of psychiatric treatment and a military discharge with ten percent disability, shot and killed a man in the Las Vegas Club located in Las Vegas, Nevada. At the same time and place he shot an attractive cocktail waitress, as a result of which she has since been paralyzed. Upon arrest he told a police officer of his background of mental disorder and expressed the opinion that he could successfully defend the case upon the ground of insanity. Subsequently, following psychiatric examination, he was found by a jury to be insane in the sense that he could not properly undergo trial. He was committed to the state hospital. The superintendent of the hospital, Dr. Sydney J. Tillim, had been called as an expert on the hearing and had expressed his opinion that the defendant was insane. Later, Dr. Tillim, being of the opinion that treatment at the state hospital had restored defendant's sanity to the point where he could proceed with trial, gave notice of this fact to the sheriff of Clark County and called upon him to take defendant into custody and return him to Clark County in order that trial might be had. The sheriff refused to accept custody and the district attorney refused to proceed with the matter. The district court took no action. A peremptory writ of mandate from this court was issued compelling the trial court and judge to proceed with the trial. Sollars v. District Court, 71 Nev. 98, 281 P.2d 396.

At the time of trial a request that separation not be permitted was made by appellant's counsel after selection of the jury had been completed. He gave as his reason his expectation that unfavorable publicity communicated to the jury would be prejudicial to his client. The request was refused. Appellant contends that this amounted to abuse of discretion.

NRS 175.320 provides as follows: "The jurors sworn to try a criminal action may, at any time before the submission of the case to the jury, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer."

The jury, before each separation, was admonished by

the court, in part, as follows: "The court admonishes you that it is your duty not to converse among yourselves or with anyone else pertaining to any matter connected with this trial or to *read any newspaper account thereof* nor to listen to, nor observe, any radio or television comments thereon, nor to form or to express an opinion thereon until the case is finally submitted to you." (Emphasis supplied.)

The appellant's expectations of unfavorable publicity were borne out. The two daily newspapers published in the Las Vegas area carried daily accounts of the progress of the trial from May 31 through June 6, 1955. The story of prejudice is written in the headlines. Here the newspapers departed from objective reporting to express their editorial views. Here they proceeded to weigh evidence, judge the validity of the defense of insanity, imply that the burden should be upon the defendant and emphasize the significance of certain pieces of evidence. This was matter which, under the judge's admonition, it may be assumed the jurors absorbed, for it was only through a reading of headlines that the members of the jury could determine, under the admonition, what articles they must not read.

We need not quote the daily series in full. A reference to two should suffice in demonstrating that prejudice resulted. On June 2, 1955 the Las Vegas Sun carried a seven-column, page one headline, stating "Sollars Phony Insanity Told." On June 4 the same paper carried a four-column, page one headline, stating "Ruse By Sollars Exposed." A two-column subheadline stated "Young Killer Tells Plan to Claim False Insanity."

Furthermore, on June 6, the morning of the day the case was submitted to the jury, under a two-column headline which did not too clearly relate the article to the murder trial and thus warn away the reading juror, the Las Vegas Sun reached back to 1928 for an incident in the life of the defendant's principal expert witness. (The article itself, it might be contended, did not constitute an "account" of the murder trial which, under the court's admonition, the jurors must not read.) The

lead paragraph of this article read, "Dr. Sydney J. Tillim, the psychiatrist who forced the murder trial of young Dale Eugene Sollars, and is now defending him on grounds of insanity, once was accused by a coroner's jury of negligently causing the death of a four year old child." The nature of the article was such that two days later, after the verdict of the jury had been reached, the publisher of the paper, writing in his daily column after a return from out of the state, apologized for what he conceded was a "deliberate attempt at character assassination."

We have no occasion here to judge the actions of the newspapers. The proposition which faces us is simply that the defendant had a right which it was the duty of the court to protect: a right that the adverse opinions of others be not communicated to the jury until its verdict had been reached.

Our statute upon separation of the jury goes far beyond most statutes in its accommodation of the jurors. At common law separation of the jury was forbidden in all cases. Many states today forbid it in felony cases. Most states forbid it in cases of capital offenses or where an objection to separation is made by the defendant. Such was the law of Nevada prior to 1911. Even under a statute such as our present one the power to grant separation in a capital case, over the defendant's objection, must be exercised with the greatest of care. Where there is any doubt or question the rights of the jurors to their customary daily comfort cannot weigh against the right of a defendant to fair trial for his life. Doubt and question should be aroused by an objection based upon any reasonable expectation.

The expectation of the defendant in this case would appear to have been reasonable. Public animosity was to be expected. An attractive young woman, a resident of Las Vegas, lay paralyzed as a result of the defendant's conduct. She was specified as a witness for the State. Public officials of Clark County, in well-publicized proceedings reaching to this court, had already demonstrated their impatience with Dr. Tillim and their lack

of sympathy with the successive opinions expressed by him respecting this defendant. That this attitude would find reflection in the temper of the community and of its press and would affect public expressions relating to the validity of the defense of insanity was to be anticipated as a reasonable probability. Doubt and question as to whether prejudice would result from separation must, under the circumstances, at least have been stirred to life by the defendant's statement of his grounds for objection. The admonition given to the jury in this case was wholly insufficient to lay such doubt to rest.

The State contends that before prejudice can be said to have resulted the fact of communication to the jury must be established. In this case there was no proof that any juror had read any of the headlines or articles relating to the trial or to its witnesses. The State contends that we cannot assume the fact that they were read. In McHenry v. United States, 51 App.D.C. 119, 276 F. 761, 764, 34 A.L.R. 1109, 1112, the United States Court of Appeals for the District of Columbia stated [34 A.L.R. 1109, 1112] "In this case, immediately after the jury was sworn, the trial justice cautioned them that, during their separation, they must not discuss the case with any person whatever, or permit any person to come and discuss the case with them, and must not read anything they might see in the press with regard to the case. He said they could tell by the headlines whether or not there was any reference to the case in any paper that might come into their hands. * * * No contention is made that any member of the jury violated these instructions, but it is said that the court permitted them to read the headlines, and that, since the following headline, 'Prosecution Charges Boy Slayer of Two Here Killed Man Near Boston,' appeared in one of the city papers during the trial, there is a presumption that some of the jurors read it, and hence, that prejudice resulted to the defendant. There was no proof that any of them had read it. We may assume that they saw something of the public press, as was said in the Holt Case [Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021], but not

that they saw any particular article in a particular newspaper. The mere opportunity to see it raises no presumption that it was seen."

It would seem that the McHenry case is clearly distinguishable upon the facts. It was dealing with a single headline in a single newspaper in the metropolitan area of the city of Washington. No reasonable inference could be drawn under the circumstances that the particular headline had been read by any juror. In the case before us we have a daily sequence of prejudicial headlines in the only two daily newspapers serving the city of Las Vegas. If, as stated in the McHenry case, "we may assume that [the jurors] saw something of the public press" we cannot realistically avoid the assumption that they observed seven-column, page-one, headlines carried in both newspapers. If such was not the fact the State could well have overcome the inference by proof.

Upon this ground of appeal we conclude that it was abuse of discretion to permit separation of the jury over objection of the defendant under the admonition given. Communication (and consequent prejudice) having been established we conclude that the abuse of discretion demands reversal.

The remaining assignments of error have to do with the exclusion of evidence of mental disorder.

The defendant offered in evidence letters written by him while a patient at a psychiatric hospital which were intercepted by the hospital and made a part of the hospital file. They were characterized by the identifying witness, a hospital official and expert witness for the defendant, as "classic paranoid letters." They were addressed to Pope Pius XII, the Commander-In-Chief, the F.B.I., the United States Counter Intelligence, the United States Secret Service, Walter Winchell and others. The State objected to the offer upon the ground that the letters were hearsay and self-serving. The objection was sustained.

This was error. The letters clearly were not hearsay. They were offered not to establish the truth of the statements they contained but as evidence of the mental state of the writer at the time they were written. In Kimble v. First National Bank of Nevada, 73 Nev. 25, 307 P.2d 615, we held that what a man says to those about him is a reliable test of the strength or weakness of his mental condition. This rule would apply as well to written as to oral declarations.

The defendant also offered in evidence a copy of the order of his commitment to the Nevada State Hospital following the determination of the court below that he was insane for the purpose of standing trial. The objection of the State was sustained. This was error.

The order was competent, indeed indisputable, evidence that upon the commitment date the defendant was insane for the purpose of standing trial. Together with other evidence of mental disorder prior and subsequent to the criminal act charged, this evidence was material in order that the mental state of the defendant might be fully considered by the jury. As stated in 2 Wigmore on Evidence (3d. ed.) 25, sec. 233, "A condition of mental disease is always a more or less continuous one, either in latent tendency or in manifest operation. It is therefore proper, in order to ascertain the fact of its existence at a certain time, to consider its existence at a prior or subsequent time."

The order, of course, did not relate to a determination of the defendant's ability to distinguish right from wrong but rather to his ability to appreciate the nature of the proceedings being had against him and to assist in his own defense. This fact does not render the order immaterial. It had a direct bearing upon the state of the defendant's mental capacities. With respect to its bearing upon the precise issue before the jury, its weight was for the jury to determine together with all other evidence presented. People v. Kirby, 15 Cal.App. 264, 114 P. 794; State v. Duncan, 244 N.C. 374, 93 S.E.2d

421; Poole v. State, 212 Ark. 746, 207 S.W.2d 725; State v. St. Clair, Mo. 1953, 262 S.W.2d 25, 40 A.L.R.2d 903; Smedley v. Commonwealth, 139 Ky. 767, 127 S.W. 485; State v. McMurry, 61 Kans. 87, 58 P. 961; Wheeler v. State, 34 Ohio St. 394, 32 Am.Rep. 372; Hempton v. State, 111 Wis. 127, 86 N.W. 596; Sherrill v. People, 75 Colo. 401, 225 P. 840. See People v. Superior Court of Contra Costa County, 4 Cal.2d 136, 142, 47 P.2d 724, 730.

Reversed and remanded for new trial.

BADT, C. J., and EATHER, J., concur.