JEROME KUK, APPELLANT, v. STATE OF NEVADA, RESPONDENT.

No. 4693

June 2, 1964                                           392 P.2d 630

[Rehearing denied July 6, 1964]

*Springer & Newton,* of Reno, for Appellant.

*Harvey Dickerson,* Attorney General, of Carson City; *Edward G. Marshall,* District Attorney, Clark County, and *Melvin D. Close, Jr.,* Deputy District Attorney, of Las Vegas, for Respondent.

## OPINION

By the Court, THOMPSON, J.:

During the afternoon of October 18, 1958, at the Kuk home in Boulder City, Jerome Kuk killed Steve Bowman by firing four bullets into his body. Kuk admitted the homicide, and only he witnessed the slaying. When apprehended he was standing over the corpse with a

.38 special caliber Colt revolver in his hand and said to the officer, "If he moves, I'll shoot him again." The fatal bullets were fired from that revolver. Earlier on the same day Kuk had shot at a moving car. A bullet struck a boy in the car. The boy died a few days later. Kuk had been drinking before the shooting episodes, and was under the influence of alcohol. Four and one-half hours after slaying Bowman, a chemical analysis of Kuk's blood revealed an alcohol content of .20. The record does not show that he had ingested alcohol after shooting Bowman. Yet, soon after the slaying, his speech was coherent and his gait steady. He telephoned the police and reported the occurrence. His conduct immediately following the slaying, in some respects, was strange. He handcuffed the decedent. When the officer arrived and asked Kuk to surrender the gun, Kuk turned toward him and said, "I'll kill you," and placed the gun against the officer's stomach, and then released it and it fell to the floor. As the officer attempted to retrieve it, Kuk elbowed him, knocking him three or four feet away. Kuk then picked up the gun and gave it to the officer.

While in custody at the Boulder City police station Kuk was questioned on three separate occasions. The first interrogation was at 5:30 p. m. on October 18. Among other things Kuk said, "I killed the man because he was possessing narcotics and a firearm. I was protecting my own life." That interrogation was discontinued because Kuk was not clear in his responses. An hour and a half later he was again questioned. He said the decedent was a "user"; that he did not know his name; that the decedent was "hot" and a murderer; that the decedent "shot at me first, then I shot him dead." On the next day, October 19, 1958, Kuk, when questioned, related a different story. He had been sleeping. When he awakened, Bowman was standing in front of him and said, "I'll kill you." Kuk walked into his bedroom, got his pistol, and shot Bowman. He stated that he had never seen nor heard of Bowman before.

On November 12, 1958, a criminal complaint was filed, charging Kuk with the murder of Bowman. A preliminary hearing was held December 4, 1958, and

Kuk was held to answer in the district court. An information was then filed. In March of 1959 the court committed Kuk to the Nevada State Hospital. He had been found to be insane in the sense that he could not properly stand trial. Through treatment Kuk's sanity was restored to the point where he could proceed with trial and, finally, on June 25, 1962, trial commenced. Kuk's defense was that criminal responsibility was precluded by reason of insanity. NRS 178.400.

In addition to the facts already related, some of the evidence introduced at the trial established that Bowman was unarmed. Before the slaying he and Kuk were seen in the living room. Bowman was seated on the end of a couch. He held a drinking glass. Kuk, who was also seated, held a drinking glass in his left hand and the revolver in his right. He told the observer to "get the hell out of here" and the observer left. The autopsy revealed Bowman to be of middle age, muscular, and weighing about 200 pounds. Kuk was 6 feet 6 inches tall and weighed about 235 pounds. As to insanity, all of the expert witnesses agreed that Kuk was medically ill when he killed Bowman. The state's witnesses, however, testified positively that Kuk was legally sane; that he knew the nature and quality of his act and that he knew he was doing what was wrong. The defense experts disagreed, testifying that Kuk was legally insane.

The jury found Kuk guilty of first degree murder and fixed his punishment at life imprisonment without the possibility of parole. Judgment and sentence were duly entered. Kuk appeals.

Though urged to do so, we perceive no basis for voiding the jury verdict on the ground that the evidence is insufficient. Our appellate jurisdiction in criminal cases is limited to questions of law alone. Nev. Const. Art. 6, § 4; State v. Fitch, 65 Nev. 668, 200 P.2d 991. It was permissible for the jury to find a willful, deliberate and premeditated killing. Four bullets were fired into Bowman, and Kuk said, "If he moves, I'll shoot him again." Such evidence alone warrants an inference that, before

the first shot was fired, Kuk had formed a deliberate design to kill Bowman. State v. Loveless, 62 Nev. 312, 150 P.2d 1015; Pinana v. State, 76 Nev. 274, 352 P.2d 824. Similarly it was the province of the jury to determine whether Kuk was animated by malice, express or implied. NRS 200.020; State v. Acosta, 49 Nev. 184, 242 P. 316. Nor may we rule, as a matter of law, that Kuk's voluntary intoxication so beclouded his mind as to require a reduction in the degree of the crime. The observation of Kuk by some of the witnesses who saw him shortly before and soon after the slaying, and who testified to his speech, demeanor and movement, would allow the jury to conclude that Kuk had the capacity deliberately to kill. State v. Jukich, 49 Nev. 217, 242 P. 590; King v. State, 80 Nev. 269, 392 P.2d 310; State v. Butner, 66 Nev. 127, 206 P.2d 253. Similarly, we may not declare, as a matter of law, that Kuk's mental affliction was so pronounced as to constitute legal insanity, in the face of some expert opinion evidence that Kuk knew the nature and quality of his act, had the capacity to distinguish right from wrong, and knew that he was doing wrong when he killed Bowman. State v. Lewis, 20 Nev. 333, 22 P. 241; Sollars v. State, 73 Nev. 248, 316 P.2d 917 (reaffirming the right and wrong test). We therefore conclude that all assigned errors attacking the sufficiency of the evidence are without merit. For the same reason we overrule the appellant's objection to the instructions regarding first degree murder.

We now turn to discuss the appellant's argument that the fairness of the trial was infected by a newspaper story appearing in the Las Vegas Review Journal while the trial was in progress.[1] The opinions of the

[1]The story: "With the windup of the Jerome Kuk murder trial expected by the end of the week, the outcome presents some problems to the people of the State of Nevada who have enacted laws to protect themselves from crime.

"From the evidence presented so far, the jury of four women and eight men may have little difficulty in ruling that Kuk was

staff writer were slanted and appear to have been offered not only as "news," but also to influence the jurors in their decisional process. This kind of irresponsible reporting frequently impedes the administration of justice. Here, however, the court specifically asked the jurors the next day whether any of them had read the story. None of them responded. In Sollars v. State, 73 Nev. 248, 316 P.2d 917, on which the appellant relies, no such inquiry was made of the jurors. There the court inferred that a daily sequence of prejudicial stories during the progress of the trial was communicated to the jurors who had been permitted to separate during the recesses of court, and concluded by stating, "If such was not the fact the state could well have overcome the inference by proof." We may not indulge an inference of communication in this case. To the contrary. We must assume that the jurors, or any of them, would have answered the court's inquiry affirmatively had the news article been read. The proof lacking in Sollars v. State, supra, is thus supplied in this case. Therefore, we reject this claim of error.

---

insane at the time he went beserk on Oct. 18, 1958, and shot two persons to death.

"IF THAT is their verdict, what happens then?

"Kuk, 28, would be sentenced to the Nevada State Hospital. The presiding judge can't send a man to prison for an insane act.

"But, the problem is that Kuk just got out of the Nevada State Hospital a few months ago. Doctors examined him and decided that he had recovered from the mental illness that plagued him for three years after the tragic Boulder City killings.

"Since the state hospital doesn't keep 'well' persons within its confines, it would be only a matter of a brief period of time, say a month at the outset, before Kuk underwent additional examinations and could be judged cured.

"He would then be released from the hospital—free to roam the streets and partake in whatever indulgences triggered his first shooting spree.

"Kuk could only be sent to the penitentiary if the jury disregarded the medical testimony and decided that Kuk had all of his mental capabilities at the time of the shooting. He has already been adjudged insane on two previous court hearings and sent to the state hospital each time.

"His case is one which points to a serious void in Nevada's institutions and treatment for the mentally ill."

Next, the conviction is assailed because the court failed to give three instructions, one relating to self defense, another to circumstantial evidence, and the third to the legal significance of insane delusion. The instructions were not submitted to the trial court. No request was made that any of them be given. Notwithstanding this fact, it is the appellant's present contention that each instruction is so basic and fundamental to this case that the court was obliged to instruct the jury on its own volition. Though we can imagine cases where the court would be required to give certain instructions, whether requested or not, the instructions here mentioned in the context of this case were not required. With reference to the failure to instruct on self defense, we believe that the court's language in State v. Acosta, 49 Nev. 184, 242 P. 316, is appropriate here. In Acosta the court stated, "It is true the court did not instruct on that point [self defense], but it was the duty of the defendant, if he desired such an instruction, to request it. This was not done. In this connection we may say that, from a reading of the entire testimony, we are clearly of the opinion that the defendant was in no way prejudiced because of the failure to instruct on the point made."

Nor do we accord credit to the appellant's argument that a particular instruction on circumstantial evidence had to be given. The court did instruct the jury as to the distinction between direct and circumstantial evidence. Further instruction on the subject of circumstantial evidence alone was not required, in view of Kuk's many admissions that he had killed Bowman. People v. Gould, 54 Cal.2d 621, 7 Cal.Rptr. 273, 354 P.2d 865, Annot., 40 A.L.R. 571.

In Nevada the legal test of insanity is the "right and wrong" test. State v. Lewis, 20 Nev. 333, 22 P. 241;

Sollars v. State, 73 Nev. 248, 316 P.2d 917.[2] The jury was correctly instructed about that standard and its meaning. However, the appellant contends that an additional instruction was required dealing particularly with the concept of an insane delusion (delusional insanity) as precluding criminal responsibility. We do not agree. The "right and wrong" test includes delusional insanity. For example: If Kuk's mind was so diseased as to destroy his capacity to know the nature and quality of his act, he was legally insane under the first part of the test. On the other hand, if he did know the nature and quality of his act, but did not know that it was wrong (perhaps because of a delusion that it was right to kill a narcotics user, etc.), he was legally insane under the second portion of the test. The appellant's argument regarding delusional insanity is based in part upon language found in State v. Lewis, supra. We find much of the language in the Lewis case confusing. If it may be read as approving a legal test of insanity, in addition to the "right and wrong" test, we expressly overrule that part of the opinion.

Next, we must decide whether the court committed error by instructing the jury about the consequences of a verdict of not guilty by reason of insanity. The court told the jury that if the defendant is acquitted by reason of the defense of insanity, "the finding of the jury shall have the same force and effect as if he were regularly adjudged insane as now provided by law, and the judge thereupon shall forthwith order that the defendant be confined in the Nevada State Hospital until he is regularly discharged therefrom in accordance with law." The instruction embodies the language of NRS 175.445. The court further instructed the jury that "in the event the Defendant is so confined in the Nevada State Hospital he may be discharged therefrom at any

[2]The test: "To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong."

time, if, in the opinion of the superintendent of the hospital the Defendant has recovered from his mental illness." The instructions are challenged on the ground that they deal with punishment. The challenge is unfounded. The purpose of the instruction is to inform the jurors that if they find the defendant insane, and acquit, he will not walk out of the courtroom a free man, but will be confined for medical treatment. A verdict of not guilty by reason of insanity means neither freedom nor punishment. It does mean that the accused will be confined in a hospital for the mentally ill until he has recovered his sanity and will not, in the reasonable future, be dangerous to himself or others. Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957). We think that the jury should know the consequences of such a verdict. In the Lyles case the court held that, where the defense of insanity is fairly raised and it does not affirmatively appear from the record that the defendant does not want the instruction, it is not error to inform the jury of the consequences of the verdict of not guilty by reason of insanity. In our view the propriety of giving the instruction should not depend upon whether the defendant wants it. Indeed, in Nevada, all written instructions given in a criminal case are deemed excepted to, and any error regarding them may be reviewed on appeal. NRS 175.515; Harvey v. State, 78 Nev. 417, 375 P.2d 225. [NRS 175.515 does not apply if the instruction was not requested below. Accordingly, we did not mention this statute when discussing the failure to instruct about self defense.] Thus, the merit of an instruction must be determined by reference to that instruction and others, if any, given upon the same subject. The defendant's right to question its propriety is preserved by statute and need not be especially asserted in the trial court. We hold that it is not error to instruct the jury about the consequences of a verdict of not guilty by reason of insanity.[3]

---

[3]The problem just discussed is to be distinguished from that of instructing a jury about the possibility of parole in the event the accused is found guilty. On the latter question, attention is directed to a comprehensive opinion in People v. Morse, 36 Cal.Rptr. 201, 388 P.2d 33.

The appellant next contends that the prosecutor committed reversible error in his closing argument to the jury by stating, "Well, now, if you find him mentally or legally insane we are going to send him up to our beautiful hospital and they are going to take care of him. Well, you saw the reports of Doctor Tillim. Two days after he was there, he was all restored and I don't know how much more you can ask because as soon as he gets back to that miraculous hospital, he becomes well and when he becomes well, these people turn him loose." The sarcasm was inappropriate. The statement should not have been made. It conveyed the plain inference that, if the defendant is found not guilty because of insanity, he would shortly be released from the hospital—an invitation to the jury to base its decision as to innocence or guilt upon that consideration rather than upon the evidence. However, defense counsel did not object to the statement. The absence of an objection, and our careful review of the entire record, cause us to conclude that the substantial rights of the accused were not affected by the prosecutor's remark. NRS 169.110; cf. Lyles v. United States, supra.

Finally, the appellant contends that the prosecutor should not have questioned certain witnesses about a "urethral discharge" of which a notation was made in Kuk's military medical record. The defendant had introduced the record into evidence. No objection was made to the prosecutor's later questions. This claim of error is patently without validity.

Affirmed.

BADT, C. J., and McNAMEE, J., concur.